**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **vs.** | ) | **Criminal Action No. 11-00012-KD** |
| | ) | |
| **LEROY WATERS, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>ORDER</u>

This action is before the Court on the motions for judgment of acquittal pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure filed by defendants Jeff Vernon (doc. 548),[1] Chris Vernon (doc. 550),[2] Lori Brill (doc. 554),[3] and Butch Brill (doc. 555); the motions for new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure filed by defendants Jeff Vernon (doc. 549)[4] and Chris Vernon (doc. 556)[5];  the United States' response to Butch Brill's motion for judgment of acquittal(doc. 560); the United States' response to all other motions (doc. 561 ); and the replies filed by Chris Vernon (doc. 562) and Jeff Vernon (docs. 564, 566).[6]

Upon consideration of the arguments and opposition, the Court rules as follows:

---

[1] Jeff Vernon adopts and joins Chris Vernon's motion for judgment of acquittal. (Doc. 553).  Jeff Vernon's motion for oral argument (doc. 565) is DENIED.

[2] Chris Vernon adopts and joins Jeff Vernon's motion for judgment of acquittal. (Doc. 550, p. 1, n.1).

[3] Lori Brill adopts the arguments raised by defendants Jeff Vernon and Chris Vernon. (Doc. 554).

[4] Jeff Vernon adopts and joins Chris Vernon's motion for new trial. (Doc. 557).

[5] Chris Vernon adopts and joins Jeff Vernon's motion for new trial. (Doc. 556, p. 1).

[6] Jeff Vernon adopts and joins in Chris Vernon's reply. (Doc. 566).

Defendant Butch Brill's motion for a judgment of acquittal (doc. 555) as to Count One is **DENIED** for the reasons set forth in the United States' response (doc. 560);

Defendant Lori Brill's motion for a judgment of acquittal (doc. 554) as to Count One, Count Three, Count Ten, Count Eleven and Count Twelve is **DENIED** for the reasons set forth herein and in the United States' response (doc. 561, n.1);

Defendant Chris Vernon's motion for a judgment of acquittal (doc. 550) as to all Counts is **GRANTED** for the reasons set forth herein; Defendant Chris Vernon's motion for new trial (doc. 556) is **GRANTED** in the alternative;

Defendant Jeff Vernon's motion for a judgment of acquittal (doc. 548) as to all Counts is **DENIED** for the reasons set forth in the United States' response and herein; and Defendant Jeff Vernon's motion for new trial (doc. 549) is **DENIED**.

## I.  Statement of the Law

### A.  Motion for Judgment of Acquittal.

Rule 29 of the Federal Rules of Criminal Procedure states that, "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).  The Rule also provides that the "court may reserve decision on the motion, proceed with trial . . . submit the case to the jury, and decide the motion . . . after [the jury] returns a verdict of guilty[.]"  Fed. R. Crim. P. 29(b).  Where the Court has reserved decision, "it must decide the motion on the basis of the evidence at the time the ruling was reserved." *Id*.  Also a " defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later."

Fed. R. Crim. P. 29(c)(1).  The Rule also provides that "[i]f the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed" and that the "court must specify the reasons for that determination." Fed. R. Crim. P. 29(d)(1).

"A [Rule 29] motion for judgment of acquittal is a direct challenge to the sufficiency of the evidence presented against the defendant." *United States v. Aibejeris*, 28 F. 3d 97, 98 (11th Cir. 1994) (footnote omitted).  Therefore, "district courts should apply the same standard as that used for reviewing a conviction for sufficiency of the evidence. ... The Court must view the evidence in the light most favorable to the government, ... and determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Sellers*, 871 F.2d 1019, 1021 (11th Cir. 1989) (internal citations omitted); *see United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011) (the Court must draw "all reasonable inferences and credibility choices in the Government's favor.") (citation omitted).

Also, the evidence need not "exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt ...". *United States v. Garcia*, 447 F.3d 1327, 1334 (11th Cir.2006) (citation omitted). "The jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial, and the court must accept all reasonable inferences and credibility determinations made by the jury." *Id*. at 1334 (quoting *Sellers*, 871 F. 2d at 1021) (internal quotations and citations omitted). Therefore, a "conviction must be upheld unless the jury could not have found the defendant guilty under any reasonable construction of the evidence." *United States v. Tate*, 586 F.3d 936, 944 (11th Cir. 2009) (quoting *United States v. Chastain*, 198 F.3d 1338, 1351 (11th Cir.1999)); *United States v. Hernandez*, 433 F.3d 1328, 1335 (11th Cir. 2005) (The Court must construe the evidence in the

light most favorable to the government and determine whether "any rational trier of fact could

have found the essential elements of the crime beyond a  reasonable doubt.") (citation omitted).

### B. Motion for New Trial

Pursuant to Rule 33 of the Federal Rules of Criminal Procedure, "[u]pon defendant's

motion, the court may vacate any judgment and grant a new trial if the interest of justice

requires." Fed. R. Crim. P. 33(a).  "Thus, there are two grounds upon which a court may grant a

motion for new trial: one based on newly discovered evidence . . .  and the other based on any

other reason, typically the interest of justice [.]" *United States v. Campa*, 459 F.3d 1121, 1151

(11th Cir. 2006). The decision whether to grant or deny a motion for new trial rests in the sound

discretion of the trial court. *United States v. Champion*, 813 F. 2d 1154, 1170 (11th Cir. 1987).

When addressing a Rule 33 motion "based on the weight of the evidence, a court 'may

weigh the evidence and consider the credibility of the witnesses.'" *United States v. Aguilar*, 188

Fed.Appx. 897, 901 (11th Cir. 2006) (quoting *United States v. Martinez*, 763 F.2d 1297, 1313

(11th Cir.1985)). "Courts are to grant [motions for new trials] sparingly and with caution, doing

so only in those really exceptional cases." *Id.* (bracketed text in original).  "However, a court

may grant such a new trial motion 'where the credibility of the government's witnesses [was]

impeached and the government's case [was] marked by uncertainties and discrepancies.'"*Id.*


## II.  Health Care Fraud - 18 U.S.C. § 1349,  18 U.S.C. § 1347, and 18 U.S.C. § 2.

The version of the Health Care Fraud statute in effect at the time of the acts charged in

the indictment, sets forth as follows:

Whoever knowingly and willfully executes, or attempts to execute, a scheme or
artifice--

**(1)** to defraud any health care benefit program; or

> **(2)** to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,

in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both. If the violation results in serious bodily injury (as defined in section 1365 of this title), such person shall be fined under this title or imprisoned not more than 20 years, or both; and if the violation results in death, such person shall be fined under this title, or imprisoned for any term of years or for life, or both.

18 U.S.C. §1347 (effective August 21, 1996 to March 22, 2010). [7]

"To support a conviction for health care fraud under 18 U.S.C. § 1347, the government must prove that the defendant: (1) knowingly and willfully executed, or attempted to execute, a scheme to (2) defraud a health care program or to obtain by false or fraudulent pretenses money or property under the custody or control of a health care program, (3) 'in connection with the delivery of or payment for health care benefits, items, or services.'" *United States v. Morgan*, 2011 WL 5965789, 4 (11th Cir. 2011) (slip copy) (unpublished opinion) (quoting 18 U.S.C. § 1347).

The statute criminalizing a conspiracy to commit Health Care Fraud sets forth as follows:

> Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

18 U.S.C. § 1349 (effective July 30, 2002). "In general, '[a] conspiracy is an agreement between two or more persons to accomplish an unlawful plan.'" *United States v. Soto*, 399 Fed.Appx. 498, 500 (11th Cir. 2010) (affirming convictions for conspiracy to commit health care fraud and conspiracy to commit money laundering) (quoting *United States v. Chandler*, 388 F.3d 796, 805

---

[7] Effective March 23, 2010, the following section was added "(b) With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section." 18 U.S.C. §1347(b).

(11th Cir.2004)). "What distinguishes the offense of conspiracy from a substantive offense, is that agreement is the essential evil at which the crime of conspiracy is directed." *Id.*, at 500 (citation omitted). "Thus the government must prove the existence of an *agreement* to achieve an unlawful objective and the defendant's *knowing* participation in that agreement." *Id.* (italics in original).

"Because the essential nature of conspiracy is secrecy, a conspiracy conviction may be proved by circumstantial evidence." *Id.*  "Nevertheless, '[s]ince no one can be said to have agreed to a conspiracy that they do not know exists, proof of knowledge of the overall scheme is critical to a finding of conspiratorial intent.' 'The government, therefore, must prove beyond a reasonable doubt that the conspiracy existed, that the defendant knew about it and that he voluntarily agreed to join it.' " *Id.*  "But, '[a] defendant may be found guilty of conspiracy if the evidence demonstrates that he knew the "essential objective" of the conspiracy, even if he did not know all its details or played only a minor role in the overall scheme.'" *Id. (*quoting *United States v. Guerra*, 293 F.3d 1279, 1285 (11th Cir.2002)).

11th Cir. 2010.

"The very nature of conspiracy frequently requires that the existence of an agreement be proved by inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." *United States v. Mateos*, 623 F.3d 1350, 1362 (11th Cir. 2010) (quoting *United States v. Molina*, 443 F.3d 824, 828 (11th Cir. 2006)).  "Likewise, '[a] conspiracy conviction will be upheld ... when the circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious that knowledge of its character can fairly be attributed to [her].'" *United States v. Mateo*, 623 F. 3d at 1362 (quoting *United States v. Figueroa*, 720 F.2d 1239, 1246 (11th Cir.1983)) (brackets in original).

6

## A. Procedural Background

In October 2011, the United States filed its second superseding indictment.(Doc. 256).[8]

The indictment charges that it is a violation of 18 U.S.C. § 1347(a)

> to knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program, and to obtain, by means of false and fraudulent pretenses, representations, and promises, money, and property owned by, and under the custody and control of, a health care benefit program in connection with the delivery of and payment for health care benefits, items, and services.

(Doc. 256, p. 7).

In Count One, defendants Lori Brill and Butch Brill are charged with conspiracy to commit Health Care Fraud. They were charged with conspiring together and with others[9] including employees of Lori Brill's businesses, Hemophilia Management Services, Inc. (HMS) or Helping Hearts of Hemophilia (a thrift store), to increase the amount of money Brill/HMS would receive as commission payments for filling HMS patients' prescriptions for hemophilia medication with specialty pharmacies Medfusion Rx, LLC, (Medfusion) and Hemophilia Infusion Managers, LLC (HIM).  Specifically, the indictment charged that the Brills and others 1) falsified patients' prescription tracking logs,  2) pressured patients and caregivers to order

---

[8]  Certain sentences, phrases and paragraphs were stricken on motion of the defendants. (Docs. 283, 477).  The United States dismissed Counts Eight, Thirteen and Eighteen. (Doc. 487). Counts Nineteen through Twenty-Three as to defendant Leroy Waters were severed for trial in *United States v. Waters*, Criminal Action No. 12-CR-0001-KD. (Doc. 382).  Waters entered a plea of guilty to Count Fifteen in this action and Count Twenty in Criminal Action No. 12-CR-0001-KD. (Doc. 546; Doc. 7, respectively).

[9]  The indictment charges that from November 2007 to November 2009, Butch Brill, Lori Brill, Travis Goodwin, Ashley Sprinkle and Sherry Demouey conspired to increase the medication ordered through HIM and Medfusion.

more factor medication than necessary, 3) fraudulently enrolled one non-Alabama resident in the Alabama Medicaid program, 4) took steps to ensure that the amount of factor medication ordered did not decrease, and 5) directed patients to switch to a more expensive factor medication.

In Count Two the Brills were charged with enrolling a non-resident for Alabama Medicaid in order to fill his factor medication prescriptions.  In Count Three the Brills were charged with knowingly falsifying and submitting medication tracking logs, which were used to order excess factor medication through HIM and Medfusion and was then billed to Alabama Medicaid and Blue Cross Blue Shield of Alabama.

The jury found Butch Brill guilty as to Count One and not guilty as to Counts Two and Three.  The jury found Lori Brill guilty as to Counts One and Three and not guilty as to Count Two.

The following motions regarding the Health Care Fraud offenses remain before the Court: Butch Brill's motion for judgment of acquittal as to Count One; and Lori Brill's motion for judgment of acquittal as to Counts One and Three.[10]

**B. Facts and Analysis - Counts One, Two and Three**

Lori Brill's son and Butch Brill's stepson, David Skowronski, is a hemophiliac.  In learning to care for David, Lori Brill learned the procedure for obtaining the necessary hemophilia medication (also known as factor medication) and getting the costs reimbursed through Medicaid.  From that knowledge, she began to help other parents, caregivers and patients that were dealing with the hemophilia.  Lori Brill formed Hemophilia Management Services, Inc., (HMS) and began to provide health care services. She primarily hired employees

---

[10] As to Counts One and Three, Lori Brill provides no authority or arguments to support her request for a Rule 29 judgment of acquittal.

for HMS who were either hemophiliacs or had family members with hemophilia.

As part of her business, Lori Brill provided counseling to hemophilia patients and caregivers, and assisted patients with transportation to doctor's appointments. She also referred her clients to two specialty pharmacies, Medfusion and HIM to fill their factor medication prescriptions. The referred patients filled prescriptions that were reimbursed, at least in part, by either Alabama Medicaid or Blue Cross Blue Shield.

The United States presented evidence that Lori Brill and Butch Brill conspired to commit and Lori Brill committed Health Care Fraud by taking actions to increase Lori Brill's commissions at both pharmacies. Specifically, the evidence supported a finding that Lori Brill encouraged her clients to order excessive unnecessary factor medication and directed the falsification of patient logs to justify the amount of factor medication ordered.  As detailed in the United States' response (Doc. 560), the evidence further supported a finding that Butch Brill participated in the scheme to fraudulently increase Lori Brill's commissions.

Accordingly, the motions for acquittal as to Counts One and Three are DENIED.


## III.  The Anti-Kickback Statute - 42 U.S.C. § 1320a-7b(b)[11]

The version of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) addressing "Illegal remunerations", in effect at the time of the acts charged in the indictment, sets forth as follows:

> **(1)** whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind--

---

[11] Defendants Anthony Eric Mosley and James Anthony Goins, were the co-owners of HIM.  In Count Four, the United States indicted Mosley, Goins, and Lori Brill for conspiracy to violate the Anti-Kickback Statute and in Counts Five, Six and Seven, all three were indicted for violation of the Anti-Kickback Statute. The jury found Lori Brill, Mosley, and Goins not guilty as to all four counts.

(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person--

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b) (effective January 1, 2006 to March 22, 2010).[12]

Generally, the United States must prove that (1) the Defendant knowingly and willfully offered, paid, solicited, or received remuneration; (2) the remuneration was offered, paid, solicited, or received, at least in part, to induce or in exchange for the referral of a patient insured by a federal healthcare program; and (3) the patient's services were covered, in whole or in part, by a federal healthcare program. (Final jury instructions)  *See* Jason Chimon, George C. Chipev,

---

[12] Effective July 1, 2010, the following section (h) was added: "With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section.".

Timothy Feulner, <u>Health Care Fraud</u>, 48 Am. Crim. L. Rev. 783, 10 (Spring 2011)  ("To convict under the federal Medicaid Anti-Kickback Statute, the government must prove three elements. It must show that the defendant: (i) knowingly and willfully, (ii) solicited or received remuneration, (iii) in return for, or to induce, referral of program-related business.") (footnotes omitted).

### A. Procedural Background

In Count Nine, Jeff Vernon, Chris Vernon and Lori Brill were charged, pursuant to 18 U.S.C. § 371, with conspiracy to violate the Anti-Kickback Statute.  Defendants Jeff Vernon and Chris Vernon are brothers.  Jeff was the Chief Executive Officer and Chris was the Chief Financial Officer of Medfusion.  Specifically, Jeff Vernon, Chris Vernon, and Lori Brill are charged with conspiring to pay kickbacks in the form of Medfusion commission payments to HMS to induce Lori Brill to refer patients to Medfusion to fill their hemophilia medication prescriptions.   The jury determined that each defendant was not guilty on this charge.

In Counts Ten through Twelve, Jeff Vernon, Chris Vernon and Lori Brill are charged with substantive violations of the Anti-Kickback Statute.  Specifically, they are charged with paying remuneration or kickbacks to Lori Brill in the form of three checks identified as commissions payments to HMS, Brill's corporation.  The jury found each defendant guilty of Counts Ten through Twelve.

In Count Fourteen, Jeff Vernon and Leroy Waters are charged with conspiracy to violate the Anti-Kickback Statute. They are charged with conspiring to pay remuneration or kickbacks in the form of commission payments to Leroy Waters to induce him to refer patients to Medfusion to fill their hemophilia medication prescriptions.  In Counts Fifteen through Seventeen, Jeff Vernon and Leroy Waters are charged with substantive violations of the Anti-

Kickback Statute.  Specifically, they are charged with paying and receiving remuneration or kickbacks in the form of three checks identified as commissions and made payable to Waters.[13]

Waters plead guilty to Count Fifteen of the second superseding indictment under a plea agreement wherein the United States will dismiss the remaining counts against him.   The jury found Jeff Vernon guilty as to Counts Fourteen through Seventeen.

The following motions regarding the Anti-Kickback Statute offenses are now pending before the Court: Lori Brill's motion for judgment of acquittal as to Counts Ten through Twelve; Chris Vernon's motion for judgment of acquittal as to Counts Ten through Twelve;  Jeff Vernon's motion for judgment of acquittal as to Counts Ten through Twelve and Counts Fourteen through Seventeen; Chris Vernon's motion for new trial; and Jeff Vernon's motion for new trial.

### B) Facts and Analysis –  Counts Ten through Twelve

From late 2007 until September 2009, Lori Brill, though her company HMS, provided client services in return for a percentage of the gross profits generated from clients with hemophilia that she referred to Medfusion for prescription fills.  Medfusion's attorney prepared a Representation Agreement with HMS which Jeff Vernon signed and sent to Lori Brill.  Under the agreement, Lori would receive a commission of forty-five to fifty percent of the profits from Medfusion's filling of prescriptions for her clients.   Lori never signed the agreement, but the records obtained from Medfusion support that she received commissions as indicated in the agreement.   The United States sought to establish that by paying Lori Brill a commission based on these referrals, Medfusion's Chief Executive Officer Jeff Vernon and Chief Financial Officer

---

[13] At the close of the United States' case-in-chief, Chris Vernon moved for judgment of acquittal pursuant to Rule 29(a) and the motion was granted as to Counts Fourteen through Seventeen for reasons set forth on the record. (Doc. 546, order on jury trial).

Chris Vernon violated the Anti-Kickback Statute.

### 1) Chris Vernon

The Anti-Kickback Statute, inter alia, prohibits a pharmacy from giving a thing of value to a person in return for a referral of a patient whose prescriptions are reimbursed by Medicaid. However there are exceptions to this prohibition known as safe harbors; there are approximately twenty-two contractual arrangements that do not violate the Anti-Kickback Statute.   To say the least, navigating through the exceptions to the Anti-Kickback Statute is a potential minefield for the uninformed. Thus, Congress deemed it necessary to require the United States to prove that any violation of the Anti-Kickback Statute was not only knowingly, but also willful. Willfulness is the conscious awareness of wrongdoing.  This does not mean that the defendant must be aware that his actions specifically violate the Anti-Kickback Statute.  However, there must be sufficient evidence that the defendant acted with a bad purpose.  *United States v. Starks*, 157 F. 3d 833, 837-838 (11th Cir. 1998)  ("The word willfully" . . . " means the act was committed voluntarily and purposely, with the specific intent to do something the law forbids, that is with a bad purpose, either to disobey or disregard the law."

In an attempt to determine what constitutes sufficient evidence of a willful violation of the Anti-Kickback Statute, the undersigned has considered the following cases that have previously addressed this issue:

In *United States v. Job*, 387 Fed.Appx. 445 (5th Cir. 2010) the Court found sufficient evidence to establish a knowing and willful violation of the Anti-Kickback Statute where the doctor defendant acknowledged his awareness of the law and the evidence indicated that he performed only "perfunctory" assessments.  Specifically, the Court delineated:

Dr. Anthony explained to Job that he was aware of Medicare's procedures and requirements, particularly the requirement of a CMN; therefore, the evidence showed he was aware of the law's requirements. Further, the evidence showed Dr. Anthony "assessed" beneficiaries in a perfunctory fashion. Avery testified that, at the Smithville hotel, Dr. Anthony would "ask [the beneficiaries] a few questions, tap them in the back, hit them on their knee, take their blood pressure, and [say] next". He conducted no further tests.

Moreover, the nature of his assessments showed his guilty knowledge. His "assessments" of beneficiaries took place in group homes, hotels, and, in one instance, a church. Dr. Anthony told Avery he needed to hide where the assessments took place, and he subsequently produced a prescription pad with Job's Richmond Medical name and address in the heading, despite not conducting "assessments" there. Moreover, the beneficiaries' lack of medical need supports the inference that Dr. Anthony was motivated by the kickbacks and intended to violate the law by writing prescriptions. In order to legitimately qualify for a power wheelchair, a person was required to have a muscular problem that would prevent him from being able to operate a manual wheelchair. Avery testified that, for the beneficiaries in Smithville: "Nobody came in wheelchairs. Nobody came on crutches. They all walked in; they all got out of cars." In fact, Avery testified that, on one occasion, "Dr. Anthony got so angry because he was seeing a lot of patients and they all [came] walking in there and he instructed me to tell the marketers, '[L]ook, you need to tell these damn people they need to bend over or walk slow or act like they are limping or something, they got to do their part' ". Finally, Dr. Anthony was paid only for patients for whom he wrote a prescription for a power wheelchair; if they did not pass his "assessment", he was not paid his $250 fee. He prescribed a wheelchair for every beneficiary he "assessed". He was paid in cash for these assessments, and he did not bill Medicare for them. He told Avery he did not mind taking long-distance trips to see large groups of beneficiaries because the money he received was greater than what he would receive from Medicare.

*Id*. at 458.

In *United States v. Mittal*, 36 Fed. Appx. 20 (2nd Cir. 2002) the Court found sufficient

intent where,

[t]he evidence clearly established Mittal's actual knowledge of the Medicare anti-kickback statute. Dr. Pritpal Kang testified that in 1993, he, Mittal, and another colleague sought legal advice from the law firm of Proskauer, Rose, Goetz and Mendelsohn regarding a diagnostic center that they jointly owned. The three men met with a lawyer at the offices of Proskauer Rose for about two hours, and after the meeting, the lawyer sent a letter to Mittal and his colleagues summarizing the matters discussed at the meeting and his advice on those matters. The letter, eight pages of single-spaced text, identified and discussed in detail the Medicare anti-kickback statute, stating in part:

> The anti-kickback law prohibits any form of "remuneration" "in return for referring an individual to a physician for the furnishing or arranging for the furnishing of any item or service for which payment may be made" by the Medicare or Medicaid programs. Violators are subject to civil and criminal sanctions.
>
> The letter went on to describe various "safe harbors" available under the statute. Dr. Kang testified that the letter accurately reflected what was discussed at the meeting, and that he subsequently spoke with Mittal about the matters covered in the letter. This evidence of Mittal's knowledge of what was unlawful under the anti-kickback statute was not challenged or controverted by the defense.

*Id*. at 21-22.

In *United States v. Rogan*, 459 F. Supp. 2d 692 (N.D. Ill. 2006), there was evidence of payments for which no work was performed, or the compensation paid for services rendered was grossly above the fair market value.  Also, there was direct testimony from participants in the scheme that defendant specifically intended to illegally obtain patient referrals.  Willfulness was sufficiently supported when this evidence was coupled with defendant's position, background, education and experience in hospital administration. *Id*. at 723-725.

In *United States v. McClatchey*, 217 F. 3d 823 (10th Cir. 2000), the Court found that willfulness was sufficiently supported by defendant's knowledge: 1) that compensation was paid and contracts renewed annually, despite the fact that very few services were provided;  2) that the services provided in the contract were not needed by the hospital; and 3) that the financial health of the hospital was tied to continuing the compensation relationship with the referrer.

In *United States v. Norton*, 2000 WL 33281703 (W.D. Va. Nov. 14, 2000), the Court found that a willful violation of the Anti-Kickback Statute was supported by evidence that the money paid was a gross overpayment for the professional services rendered and because "two witnesses testified that Norton made statements to them characterizing the arrangement as a kickback."  *Id*. at *4.

In *United States v. Jain*, 93 F 3d 436 (8th Cir. 1996) a willful violation of the Anti-

Kickback Statute was found to be supported by evidence that a marketing agreement was actually an agreement for money in exchange for referrals. Specifically, there were conversations linking the payments under the marketing agreement to the volume of patients referred, an open willingness to exchange patients for money, and little tangible marketing support combined with demand for increase in payments and threats to send patients elsewhere.

In *United States v. Starks*, 157 F.3d 833 (11th Cir. 1998), a willful violation of the Anti-Kickback Statute was supported by evidence that the defendant paid state health employees, who worked with high-risk pregnant women, for referrals to his chemical dependency program for pregnant women. Willfulness was further supported by the fact that the defendant attempted to hide the nature of the payments by falsely coding the checks and covertly delivering the payments to the referrers.

In a light most favorable to the United States, the following facts were adduced at trial as they relate to Chris Vernon:

Chris Vernon is an owner and Chief Financial Officer of MedFusion. As part of his duties he calculated and paid commissions to Lori Brill's company HMS on a monthly basis. Chris Vernon was aware that Lori Brill was being paid pursuant to an agreement with HMS, as opposed to being paid as an employee; this is evident as the checks were made out to HMS. It can also be inferred from the evidence that Chris Vernon was aware of the manner in which the payments were supposed to be calculated, i.e. commissions based on the sale of hemophilia medications. This arrangement with HMS does not fall into a safe harbor; specifically it is not an excepted personal service contract because the compensation takes into account the volume

16

and value of the business generated.[14]  Thus, the only issue is whether Chris Vernon knowingly

_____

[14] The following payment practices shall not be treated as a criminal offense under section 1128B of the Act and shall not serve as the basis for an exclusion: …

 (d) Personal services and management contracts. As used in section 1128B of the Act, "remuneration" does not include any payment made by a principal to an agent as compensation for the services of the agent, as long as all of the following seven standards are met--

(1) The agency agreement is set out in writing and signed by the parties.

(2) The agency agreement covers all of the services the agent provides to the principal for the term of the agreement and specifies the services to be provided by the agent.

(3) If the agency agreement is intended to provide for the services of the agent on a periodic, sporadic or part-time basis, rather than on a full-time basis for the term of the agreement, the agreement specifies exactly the schedule of such intervals, their precise length, and the exact charge for such intervals.

(4) The term of the agreement is for not less than one year.

(5) The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs.

(6) The services performed under the agreement do not involve the counseling or promotion of a business arrangement or other activity that violates any State or Federal law.

(7) The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services.

For purposes of paragraph (d) of this section, an agent of a principal is any person, other than a bona fide employee of the principal, who has an agreement to perform services for, or on behalf of, the principal.

42 CFR § 1001.952(d).

and willfully violated the Anti-Kickback Statute.[15]

Because this is not a strict liability statute, Chris Vernon cannot be convicted simply because Medfusion had an illegal contract with HMS.   Rather, there must be evidence to support the requirement that Chris Vernon knew he was engaging in wrongful conduct by paying commissions to HMS.  To support this intent the United States relies on the following:[16]

1) Chris Vernon calculated the commissions and signed the checks to HMS.  (United States' Trial Exh. 108, 113, 198d, 198e, and 198f)

2) Medfusion's Employee Reference Manual specifically stated that "paying … any money …[to] third parties in connection with items or services billed to federal programs" is a violation of the Anti-Kickback Statute.  And that "[a]ll personnel and representative must be aware the payment may be unlawful even if the only purpose of a payment scheme is to influence referrals."   The Manual also counsels that "[e]mployees in the finance department or any department entering into personal service contracts are expected to be vigilant in identifying potential violations …"  (United States' Trial Exh. 119, p. 4)

3) Chris Vernon was sent and copied on emails that made it clear that HMS was being paid commission based on the amount of hemophilia medications sold.  At least one email to Chris Vernon supports a reasonable inference that he knew that at least part of the

---

[15]   The Court has also considered the other grounds asserted by Chris Vernon for judgment of acquittal and for a new trial.  The Court finds the sufficiency of the evidence challenge to be meritorious.  For reasons stated in the United States' response, the Court does not find the remaining arguments of Chris Vernon for judgment of acquittal to be meritorious.

[16] A significant portion of the evidence cited by the United States in their "consolidated" response relates only to Jeff Vernon.   Giving the United States the benefit of all reasonable inferences, only the evidence that could possibly show knowledge on Chris Vernon's part will be discussed.   It should be noted that Chris Vernon was not convicted of conspiracy to violate the Anti-Kickback Statute.

commission paid to HMS was based on the sale of hemophilia medication that was reimbursed by Medicaid.  (United States' Trial Exh. 108, 162, 163, 166, 167, 168, and 182)

4)  HMS was paid $369,371 between November 2007 and August 2009; approximately $16,800 per month in commissions.  (Trial testimony of Jeff Lockett)

5)  Chris Vernon was copied on an email exchange on May 29, 2009, between Jeff Vernon and counsel Steven Benefield[17], wherein Jeff Vernon comments "that is a substantial amount of money with no answers.  Has he come up with anything yet?"  (Vernon Exh. 5554)  Chris Vernon is also copied on a June 11, 2009 exchange wherein Jeff Vernon queries Benefield, "Is it not possible for Jim Poole to come up with a contract where we get paid a rate as a pharmacy service provider that would eliminate the kickback risk or put it on Lori?" (Vernon Exh. 5555)

6)  On July 14, 2009, Chris Vernon was copied on an email from Jeff Vernon to Victor Espinosa.  Therein, Jeff Vernon indicates that "counsel has concerns about anti-kickback statutes" as it relates to "one sales person".  (United States' Trial Exh. 180)

7)  On July 31, 2009, Stacy Walton, a nurse employed by Medfusion, copied Chris Vernon on an email sent to Jeff Vernon, which indicated that she believed there was some "creative charting" in regard to the patients that were no longer receiving shipments of hemophilia medications.  The email inquired about how to proceed with "Lori's patients (especially the Medicaid ones)".  On August 3, 2009, Chris Vernon was sent an email wherein Jeff Vernon, in response to the July 31, 2009 email, instructed Stacy Walton to have Medfusion

---

[17] Steven Benefield, an experienced attorney with Christian and Small with an LLM in taxation, testified that he drafted the HMS agreement for MedFusion and that he does not believe that it violated the Anti-Kickback Statute.  He also testified that he never spoke with Chris Vernon about the Anti-Kickback Statute.  The jury rejected the contention that Chris Vernon relied in good faith on Benefield's advice.

employees set up appointments with patients and "get charts up to speed".  (United States'

Trial Exh. 171) (Vernon Exh. 5531).

8)  Chris Vernon's name appears on one Patient Contact Form for Roy Waters next to "spoke

with".  On an additional Roy Waters Patient Contact Form, the name Chris appears next to

"spoke with".[18] (United States' Trial Exh. 265)

Chris Vernon was convicted of violating the Anti-Kickback Statute by issuing three

checks to HMS for commissions.  The checks indicate they were issued on June 23, 2008,

November 30, 2008 and August 12, 2009.  The United States' evidence of intent as it relates to

the checks issued in 2008, would necessarily be limited to the evidence delineated above in

paragraphs 1-4.

The United States argues that a willful violation can be inferred for these two checks

based on Chris Vernon's profit motive and from the fact that HMS was "grossly overpaid" for

any legitimate professional services rendered.   However, there is no evidence that, prior to July

---

[18] This evidence has not been shown to have any relevance to the charges against Chris
Vernon.  First, there was no testimony regarding the use or meaning of these forms; there was no
evidence regarding who filled out this form, why they spoke to Chris Vernon/Chris or what Chris
Vernon/Chris said.  The United States summarily states that it shows that Chris Vernon "signed
off on factor re-fills for Waters without speaking to him and verifying his need for same."   The
Court will allow that perhaps it could be inferred from the document that Chris Vernon/Chris
approved the delivery of medications to Leroy Waters.  However there is absolutely no evidence
that he did so without consulting Waters. (Although Waters pled guilty prior to trial, he was not
called as a witness.)  Moreover, any inference that Waters did not need the medication is also
unsupported by any evidence.

Next, the Court rejects any argument that this evidence should be considered as Rule
404(b) evidence. There is no evidence that Waters was a Medicaid patient, thus the Medicaid
requirements did not apply to the handling of his prescriptions. Therefore, the only possible "bad
act" was that Medfusion's internal policies were not followed. *See*, United States' Trial Exh. 119
(Employee Reference Manual, p. 202 II B. 1. "Patient will be contacted on a monthly basis to
determine if a shipment of factor is needed.")

31, 2009, Chris Vernon had any hint that HMS/Brill was not adequately performing services as a client representative.[19]   In fact, there is no evidence that Chris Vernon was even aware of the terms of the HMS/Brill's agreement with Medfusion, other than the terms concerning how payments would be calculated.  Moreover, there was no evidence that a sales commission of 45% - 50% of profits is a gross overpayment; there was no testimony regarding the standard in the industry for commissions.

As to the profit motive, the United States failed to present any evidence that Chris Vernon personally profited from the violations prior to becoming an owner in 2009, or for that matter even after 2009.[20]   Therefore, the United States is left with insufficient evidence to support a willful violation of the Anti-Kickback Statute by Chris Vernon, as alleged in Counts Ten and Eleven.

At oral argument, the United States posited that even if Counts Ten and Eleven were not sufficiently supported by evidence of willfulness, the conviction as to Count Twelve should survive.  Specifically, the United States points to the emails, explicated in paragraphs 5-7 *supra*,

---

[19] Also, there was no evidence from which it could reasonably be inferred that Chris Vernon was aware of Lori Brill's practice of encouraging her clients to order unneeded hemophilia medications or the fact that Lori Brill stockpiled unneeded medication for her son.

[20] The United States stated at oral argument that Chris Vernon became an owner of Medfusion in 2009.  Although there was no evidence presented to support this fact, the United States contends that the jury could rely on the admission of this fact by counsel in his opening statement. Counsel for Chris Vernon stated in opening statement that Chris Vernon became a salaried employee of Medfusion in 2006 and then in 2009 became an owner.  (Transcript of opening statement)  The United States' contention appears to be correct.  *See, e.g., United States v. Blood*, 806 F.2d 1218, 1221 (4th Cir. 1986) ("[A] clear and unambiguous admission of fact made by a party's attorney in an opening statement in a civil or criminal case is binding upon the party."); *United States v. McKeon*, 738 F.2d 26, 30 (2d Cir. 1984) ("An admission by a defense attorney in his opening statement in a criminal trial has also been held to eliminate the need for further proof on a given element of an offense."); *Dick v. United States*, 40 F.2d 609, 611 (8th Cir. 1930) (holding that attorney's admission during opening statement that defendant had been convicted of an offense involving sale of liquor was sufficient evidence as to that fact).

to support their argument that the jury could have reasonably inferred that at least before the August 2009 commission check was issued, Chris Vernon was put on notice that commission payments to HMS were not allowed under the Anbti-Kickback Statute.  The Court cannot agree.

There is a difference between a reasonable inference and speculation.  There was no evidence at trial that Chris Vernon was involved in procuring the contract with HMS, that he was aware of the services to be provided for payment, or that he ever participated in discussions concerning its legality. The evidence only shows that he calculated the commissions and paid them.  It is speculative to assume that Chris Vernon ever discussed the procurement of the contract or legality of the contract with Jeff Vernon or counsel. At trial, the undisputed testimony from Steven Benefield was that he never discussed the Anti-Kickback Statute or the HMS contract with Chris Vernon.  A lack of vigilance in determining the bases and legality of the commissions does not support a conviction for a willful violation of the Anti-Kickback Statute.  The emails that indicate concern over the contract are insufficient to support that Chris Vernon willfully violated the Anti-Kickback Statute.

Accordingly, the motion for judgment of acquittal is GRANTED as to all counts against Chris Vernon.   In the alternative, the Court would GRANT the motion for new trial based on the interest of justice. Specifically, "the evidence preponderates sufficiently against the verdict that a serious miscarriage of justice may have occurred . . ." *United States v. Martinez*, 763 F. 2d 1297, 1312 (11th Cir. 1985);  s*ee* Fed. R. Crim. P. 29(d) ("[T]he court must also conditionally determine whether any motion for a new trial should be granted….)

### 2) Jeff Vernon

Because the Court must consider the evidence in a light most favorable to the United States, the Court reaches a different conclusion as to Jeff Vernon.  Jeff Vernon was the owner of

Medfusion and was the person who brought HMS/Lori Brill to Medfusion.   Unlike Chris Vernon, there is evidence that Jeff Vernon was aware of the terms of the agreement with HMS as it related to the duties HMS was expected to perform.  Also, there is evidence from which a reasonable jury could infer that Jeff Vernon was aware that Lori Brill was not fully performing the duties as described in the agreement.

Moreover, although the United States failed to present any evidence of Jeff Vernon's background and experience, counsel in opening argument indicated that Jeff Vernon was a pharmacist who had worked in the specialty pharmacy industry since 1999, had formed his own company and ultimately joined and became an owner of Medfusion in 2005.   According to defense counsel, in 2005 Medfusion sales were $12 million and in 2010 Medfusion's sales were over $200 million.[21]  Therefore, a reasonable inference concerning Jeff Vernon's knowledge of the law is further supported by Jeff Vernon' experience, knowledge and background in the specialty pharmacy industry.

As to the commission payment issued in 2009, as delineated in Count Twelve, the evidence is more substantial. Although Medfusion's counsel who drafted the contract did not believe that the HMS contract violated the Anti-Kickback Statute, there was evidence that other counsel could not devise a contract to comply with the Anti-Kickback Statute.  More importantly, there was evidence that Jeff Vernon personally participated in the conversations wherein the concerns regarding the legality of the contract were discussed.   A reasonable jury could infer from this evidence that Jeff Vernon deliberately chose to disregard the law.

Accordingly, the motion for judgment of acquittal and motion for new trial as to Counts

---

[21] *See* footnote 20, *supra*.

Ten, Eleven and Twelve is DENIED. [22]

### C)  Facts and Analysis – Counts Fourteen through Seventeen

Jeff Vernon hired Leroy Waters as an employee of Medfusion in 2007.  Waters brought

with him approximately five hemophilia medication recipients who were on Medicaid and for

whom Waters had provided services while employed at another specialty pharmacy.  The United

States' evidence at trial, as delineated in its response, supports a finding that after Waters was

hired, Waters did not generate any other clients, did not provide his clients any services (services

were provided by other Medfusion employees), did not perform any work at Medfusion, and did

not comply with Medfusion's company policies regarding such things as logging work hours.

There was no oversight of Leroy Waters activities on behalf of Medfusion.  However, Waters

was paid compensation of $400,000 in 2007, $653,000 in 2008 and $325,000 in 2009.  As such

the evidence was sufficient to support a finding that Waters was not a legitimate employee and

that he was paid for his referrals in violation of the Anti-Kickback Statute.

Moreover, the Court finds the evidence, in a light most favorable to the United States,

supports a finding of a willful violation of the Anti-Kickback Statute by Jeff Vernon.  First and

foremost, prior to hiring Waters, Jeff Vernon requested and received a list of potential referrals

along with the quantities they would be ordering.  Coupling this evidence with Jeff Vernon's

experience in the health-care field, it is not unreasonable to infer that Jeff Vernon intended that

the money paid to Leroy Waters was simply for the referrals.

Accordingly, because the Court finds that the evidence was sufficient to support the

---

[22] On all other grounds asserted by Jeff Vernon for judgment of acquittal or a new trial, the Court DENIES the motions for reasons stated in the United States' response.

verdict as to Counts Fourteen through Seventeen, the motion for judgment of acquittal and motion for new trial are DENIED.[23]


### IV. Conclusion

For the reasons stated herein, the motions for judgment of acquittal and motions for new trial asserted by Jeff Vernon, Lori Brill and Butch Brill are **DENIED**.   Chris Vernon's motion for judgment of acquittal is **GRANTED,** and in the alternative, his motion for new trial is **GRANTED**.


**DONE** and **ORDERED** this the 3rd day of May, 2012.


<u>**s/ Kristi K. DuBose**</u>
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**

---

[23] On all other grounds asserted by Jeff Vernon for judgment of acquittal or a new trial, the Court DENIES the motions for reasons stated in the United States' response.